**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CAROLE KRECHMAN, Individually, and as the Personal Representative of Robert Albert Appel, deceased, *Plaintiff-Appellant*, <br><br> v. <br><br> COUNTY OF RIVERSIDE, a Municipality; ROBERT GARCIA, Deputy, ID# 4504; MARTIN ALFARO, Deputy, ID# 3485; SEAN DUSEK, Deputy, ID# 3495; EDWARD CHACON, Deputy, ID# 4505, *Defendants-Appellees*. | No. 12-55347 <br><br> D.C. No. 2:10-cv-08705-ODW-DTB <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted
June 6, 2013—Pasadena, California

Filed July 25, 2013

Before: Ronald M. Gould, N. Randy Smith,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge N.R. Smith

## SUMMARY[*]

### Civil Rights

The panel reversed the district court's Fed. R. Civ. P. 50(a) judgment as a matter of law in favor of defendants following a jury trial in this action alleging that police officers used excessive deadly force when they attempted to take custody of plaintiff's adult son.

The panel held that the district judge improperly weighed the evidence in determining that defendants' conduct was not a substantial factor in the death. The panel stated that the record suggested that the judge's personal experience and not the testimony viewed in the light most favorable to plaintiff led the court to conclude that defendants did not use excessive force. Because the standard used by the district court was not correct, the panel reversed and remanded the case for a new trial.

The panel declined to reassign the case after determining that, in spite of Judge Wright's error of law, the panel had no

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reason to believe that he  would be unable fairly and correctly to apply the Rule 50(a) standard on remand.

Concurring, Judge N.R. Smith stated that although he agreed that it was unnecessary to reach plaintiff's claim that the district court's conduct rose to a level that independently warranted a new trial, it certainly approached that line.

## COUNSEL

Dale K. Galipo (argued) and Thomas C. Seabaugh, Law Offices of Dale K. Galipo, Woodland Hills, California, for Plaintiff-Appellant.

Bruce E. Disenhouse (argued), Kinkle, Rodiger and Spriggs, Riverside, California, for Defendants-Appellees.

## OPINION

GOULD, Circuit Judge:

Carole Krechman, individually and as the personal representative of her son, Robert Albert Appel, brought a 42 U.S.C. § 1983 action for damages resulting from her son's death.  Krechman contends that police officers ("Defendants") used excessive force, resulting in Appel's death, when they responded to a 911 hang-up call and found Appel sitting unarmed in his driveway and tried to take custody of him.  After a jury trial, the district court granted judgment as a matter of law to Defendants under Federal Rule of Civil Procedure 50(a).  Krechman appeals, requesting reversal of that decision and a new trial, preferably before a

different judge. In the alternative, she asserts (1) that the district court made erroneous trial rulings that cumulatively prejudiced her substantial rights and led to the entry of judgment as a matter of law against her and (2) that the district court violated her due-process rights by engaging in conduct that amounted to an unconstitutional appearance of bias. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I

Just before 10:00 p.m. on a spring night, dispatchers received a 911 "hang up" call. The call was traced to a home in a Palm Desert gated community, and the dispatcher assigned Robert Garcia, an on-duty police officer, to inspect the location. When Garcia arrived at the front gate, a security guard told him that the home of interest was occupied by an attorney named Robert Appel and that just a few days prior, Appel was pepper sprayed by the police. Garcia entered the neighborhood and parked his patrol car down the street from the home. Stepping out of the car, Garcia heard yelling. He called for backup. Approaching the house, he noticed a man sitting in the driveway wearing nothing but sweat pants. The man stood up when he saw Garcia, ran at him, and eventually sat back down. Visually scanning the man's waistband for bulges that might be weapons, Garcia saw nothing of danger. The man screamed, "Why did you do this to me, Tina?" and other strange phrases, and then ran to hide behind a two-foot bush in the yard.

Garcia believed that the man was delusional and in need of a temporary hold for people with potential mental illness. So Garcia approached, readying his pepper spray. Using the name "Robert," Garcia coaxed the man out from behind the

bush and got him to sit down "Indian style" on the street facing the house.

Garcia then told Appel that he was not being arrested but that he was being detained so that the police could figure out what was going on. About this time, Officer Chacon arrived. Garcia then asked Appel to put his hands behind his back for handcuffing, and Appel replied "okay, okay, okay." Appel then let Garcia handcuff his left hand without incident.

But, as Appel was moving his right hand behind his back, something changed. Suddenly Appel's melancholy turned to anger, and Appel began to resist the officers' attempts to handcuff his right arm. He shouted, "no, no, no, not again, not again, no, no" and thrashed about.

Garcia then sprawled his body over Appel's upper body while Chacon grabbed Appel's legs. The two pulled Appel onto his left side and Garcia tried to perform a carotid restraint to render Appel unconscious. But Appel tried to bite Garcia's arm, so Garcia struck Appel's face three times with "hammer strikes." Appel was screaming and yelling throughout.

During this tussle, Garcia had radioed that things had become "physical," and Officers Dusek and Alfaro, who were already on their way, arrived at the scene. Alfaro shouted at Garcia to "get the fuck out of the way." Then Alfaro and Dusek each grabbed one of Appel's arms and pulled him to the chest-down position. Garcia was now holding Appel's head, and Chacon was positioned on Appel's legs. Alfaro and Dusek both used techniques intended to cause pain and immobilize Appel. During this time Alfaro's knee was on Appel's back exerting an estimated 105 pounds of pressure,

and Dusek applied his "right knee to [Appel's] right tricep" and then to the "back of [Appel's] right shoulder in the area of the shoulder blade." This prevented Appel from lifting his upper body up, allowing the officers to cuff Appel's right arm. Appel continued to scream and "violently jerk[ed] his head and shoulders upwards."

The officers' accounts of what happened next are not entirely consistent. But the testimony in substance confirmed this: Even after handcuffing was complete, Appel was "pumping his fists while they were handcuffed behind his back" and his "muscles were rigid, meaning he was flexing his arm muscles, and he was repeatedly kicking his—his feet and toes on the asphalt." Alfaro kept his knee on Appel's upper back "when he was moving and attempting to get up." Chacon placed a knee on Appel's left lower back to keep Appel down. And Dusek also had his knee on Appel's shoulder blade.

When Appel stopped moving, Alfaro assumed he was "playing possum" so Alfaro remained on Appel's back for a bit.[1] Then some of the officers grew concerned; Chacon tried to check Appel's pulse, but was told by Alfaro to get away from Appel's face. The officers turned Appel face-up and noticed that his eyes and mouth were open. They then moved

---

[1] Alfaro's testimony was contradictory about whether he remained on Appel's back after it was apparent that Appel was unresponsive. But in considering whether judgment as a matter of law was properly granted, we must "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)). So we presume that Alfaro remained on Appel's back even after Appel stopped moving.

Appel "up alongside of the curb on the street" and started to monitor his vital signs. The officers testified that Appel was breathing at this time, but Appel was unresponsive. After Appel "arched his back considerably and looked uncomfortable," the officers laid him on his back in the grass on an elevated yard. At 10:43 p.m., the officers called the paramedics. While waiting for them, the officers checked Appel's pulse, but CPR was not performed and the handcuffs were not removed. Sadly, Appel did not have a pulse and was not breathing when the paramedics arrived at 10:51 p.m. Appel was rushed to the hospital, where he was eventually pronounced dead.

In November 2010, Appel's mother and stepfather filed this action in the district court, seeking compensatory and punitive damages under 42 U.S.C. § 1983 to redress various constitutional violations, including violations of Appel's Fourth and Fourteenth Amendment rights. They also brought state-law claims, including negligence. The district court held a six-day jury trial. All four of the involved officers testified. So did a responding paramedic, the coroner, an expert witness on police practices, several expert physicians, and Carole Krechman.[2]

At trial, Defendants presented a theory that Appel died suddenly of natural causes, specifically kidney failure that caused cardiac arrhythmia, unrelated to the altercation with the police. An emergency physician named Dr. Gary Vilke testified in support of this theory. He said that Appel's blood-

---

[2] Before the close of the case, Sheldon Krechman and the Riverside Sheriff's Department were dismissed as parties, leaving only the § 1983 claims arising from violations of the Fourth Amendment and a supplemental negligence claim.

chemistry panel at the emergency room showed a potassium level of more than 10 where the "normal range is between 3.5 and 5 or 5.1," and he noted that potassium levels higher than 6 can start to cause electrical activity changes and stress the heart. Dr. Vilke further said that Appel had elevated creatinine and magnesium levels, "which means his kidneys weren't working."

Krechman, on the other hand, contended that Appel's death was caused by excessive force. The coroner, Dr. Mark Scott McCormick, who examined Appel's body testified that he found no evidence of drugs or alcohol in Appel's system; that there were several blunt-impact injuries on Appel's torso, head, arms, and legs; that there was evidence of bleeding in an internal muscle of Appel's ear; and that Appel's heart was enlarged, which put him at a higher risk for cardiac arrhythmia. He also testified that he believed that "[t]he confrontation itself [was] a stressor that contributed to the arrhythmia" that caused Appel's death so he classified the death as a homicide.

Another expert for Krechman, Dr. Ronald O'Halloran, testified that there are two ways the encounter with police could have led to Appel's death: First, depending on what the jury believed the facts to be, the officers' actions could have caused "restraint asphyxia, compressing the chest for too long with too much weight." Second, the altercation could have caused an "adrenaline increase causing a cardiac arrhythmia from the stress of the exertion and the fear and pain associated with the restraint process." He described restraint asphyxia more specifically as occurring when "a person is in a prone position and doesn't have the use of their arms or legs to remove weight from their back, [and] weight on the back can compress the chest enough that they can't breathe

adequately to maintain blood oxygen saturation" or can't get enough blood pumped through the heart.

After the close of Krechman's case-in-chief, Defendants moved for judgment as a matter of law. The district court held a hearing on the motion after the close of evidence but deferred decision on the motion and submitted the case to the jury. After the jury hung, the district court granted the motion with respect to all of the remaining claims. Krechman filed a timely appeal.

## II

We review *de novo* a district court's grant of judgment as a matter of law. *Electro Source, Inc. v. United Parcel Serv., Inc.*, 95 F.3d 837, 838 (9th Cir. 1996). In so doing, we "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006)).

## III

We first address Krechman's legal claims to see if reversal is warranted. We then consider whether the case should be reassigned to a different district judge as Krechman requests.

## A

Krechman first contends that the district court erred in granting Defendants' motion for judgment as a matter of law by incorrectly applying the required legal standard.

A district court can grant a Rule 50(a) motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc.*, 581 F.3d at 961 (alteration in original) (quoting *Reeves*, 530 U.S. at 150). And although taking a motion under submission and ruling on it after the jury returns a verdict is proper practice, *see* Fed. R. Civ. P. 50(b) advisory committee's note, the court "may not substitute its view of the evidence for that of the jury." *Winarto v. Toshiba Am. Elecs. Components*, *Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)).

Specifically, Krechman contends that the district judge improperly weighed evidence favorable to Krechman against other evidence presented at trial and failed to draw all reasonable inferences in Krechman's favor. We agree.

The district court based its grant of judgment as a matter of law on its conclusion that Defendants' conduct was not a substantial factor in Appel's death, that neither the pre- nor post-handcuffing conduct of the Defendants violated Appel's constitutional rights, and that no negligence occurred. Because a lack of causation potentially would defeat both claims, we start with that issue before considering whether the judge erred in determining that Defendants did not violate Appel's constitutional rights or commit negligence.

**1**

The record reflects that the district judge weighed the evidence in determining that Defendants' conduct was not a substantial factor in Appel's death. During the hearing on the Rule 50(a) motion held at the close of evidence, the court stated:

> I don't even believe Dr. McCormick graduated from medical school. The first thing out of that man's mouth was in all of the autopsies that he has performed where the deceased died of a heart attack, lo and behold, there were high levels of potassium. Therefore, he has concluded that dying of a heart attack increases the potassium level in your blood. I almost fell out of my chair.

The court went on to reiterate that the coroner, Dr. McCormick, lacked credibility asking, "[a]gain, did McCormick really go to medical school?" and later stating that Dr. McCormick "doesn't understand about the electrical impulses that actually trigger the heartbeats—all right—that control the heart rhythm." There is also little doubt that this disbelief affected the court's decision to grant judgment as a matter of law because when it announced its decision on the motion, the court reiterated that it "didn't think too much of the coroner" and in fact "thought very little of the coroner."

The district court expressed similar incredulity at the testimony of Krechman's other medical expert. During the initial Rule 50(a) hearing the court asked, "I can't take the lab results as true? I have to take as true a guy that you brought down here from Ventura and paid a fortune? That is what I

have to take as true?" We confirm today that, when assessing a Rule 50 motion, the answer to that question is "yes" if the expert testified for the nonmoving party.

Defendants contend that it was proper for the court to "categorically refuse[] to accept any expert's testimony, and instead, rel[y] solely on [Appel's] lab results." But experts are used when an "intelligent evaluation of facts is . . . difficult or impossible without the application of some scientific, technical, or other specialized knowledge." *See* Fed. R. Evid. 702 advisory committee's note. Having admitted the testimony of Krechman's experts, the judge was bound to take their testimony as true for the purposes of considering whether to grant judgment as a matter of law. The record shows that he did not do this but instead took the Defendants' expert testimony as true. This is shown by the court's comment that the defense expert "pretty much just blew away these two pathologists [called by Ms. Krechman]," and that "[t]his gentleman clearly was in trouble. I personally never heard of blood pressure readings as high as this gentleman's blood pressure was."

**2**

Although the district court erred in concluding as a matter of law that Defendants' conduct was not a substantial factor in Appel's death, dismissal of the § 1983 claim was still proper if the district court correctly concluded as a matter of law that the pre- and post-handcuffing conduct of the Defendants did not violate Appel's constitutional rights. Likewise, dismissal of the negligence claim was proper if the district court correctly concluded that no negligence occurred.

But we hold that the district court's analysis of these elements was also infected by impermissible credibility assessments.  When deciding the Rule 50(a) motion, the district court stated that "once the first handcuff went on, [Appel] was armed" because a "loose handcuff is dangerous." The court shed light on this conclusion by stating, "As far as I am concerned, having been there, [a loose handcuff] is a weapon."  He also stated, "We have got a fight.  I don't know, you ever been in a street fight?  Okay.  I have been there.  I have done this.  They are in a fight."  The record suggests that the judge's personal experience and not the testimony viewed in the light most favorable to Krechman led the court to conclude that "everything that the officers did . . . while attempting to get that other hand handcuffed was not excessive and was clearly warranted by the circumstances." This led to the grant of Defendants' motion for judgment as a matter of law.  Because the standard used by the district court was not correct, we reverse and remand the case for a new trial.

**B**

Krechman next contends that (1) the district court made erroneous trial rulings that cumulatively prejudiced her substantial rights and led to judgment as a matter of law and (2) the district court violated her due-process rights by engaging in conduct that amounted to an unconstitutional appearance of bias.  But because we hold that the district court improperly applied the legal standard when granting Defendants' motion for judgment as a matter of law, we do not reach these claims.  *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) (declining to reach a potential alternative ground for remand).

**IV**

We next address Krechman's request for reassignment. We can reassign a case to a different district judge under our supervisory powers in "unusual circumstances." *See United States v. Wolf Child*, 699 F.3d 1082, 1102 (9th Cir. 2012); *see also United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001). This standard does not require a showing of "actual bias on the part of the judge who first heard the case." *Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1133 (9th Cir. 2008) (internal quotation marks and quoting source omitted). In considering whether to reassign because of "unusual circumstances," we consider the following three factors: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *United States v. Jacobs*, 855 F.2d 652, 656 (9th Cir. 1988) (quoting *Cintron v. Union Pac. R.R. Co.*, 813 F.2d 917, 921 (9th Cir. 1987)). The first two factors are equally important and a finding of either is sufficient to support reassignment on remand. *Id.* (citing *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 780 (9th Cir. 1986)).

Reassignment, however, is reserved for "rare and extraordinary circumstances," *see United Nat'l Ins. Co.*, 242 F.3d at 1118 (quoting *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 191 (9th Cir. 1989)), and we have previously held that erroneously granting a defendant's Rule 50 motion is not enough to support reassignment where

a judge "treated the parties evenhandedly and with respect," *McSherry v. City of Long Beach*, 423 F.3d 1015, 1023 (9th Cir. 2005). Although we agree with Krechman that Judge Wright made several off-color comments that may not have been well-received, the record does not suggest that he was unfair. *See California v. Montrose Chem. Corp.*, 104 F.3d 1507, 1521–22 (9th Cir. 1997) (deciding not to reassign where a judge referred to environmental scientists in a CERCLA case as "pointy heads" and "so-called experts" among other things because his verbal excesses "had no affect on his substantive decisions"). Despite his error of law in the prior hearing now under appeal, we have no reason to believe that Judge Wright would be unable fairly and correctly to apply the Rule 50(a) standard on remand. For that reason, we decline to reassign the case.

**REVERSED AND REMANDED.**

N.R. SMITH, Circuit Judge, concurring:

I agree with the majority's opinion in this case. I write separately to address Krechman's judicial bias claim.[1] I agree it is unnecessary to reach this claim, given our reversal of the

---

[1] Though Krechman claims to bring her judicial bias claim under the due process clause, the substance of her argument fits more appropriately as a freestanding judicial misconduct claim. *E.g.*, *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 531 (9th Cir. 1986); *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1990), *overruled on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam). She does not allege circumstances existed in this trial like those in which we have recognized a judge's potential bias can violate due process. *See Hurles v. Ryan*, 706 F.3d 1021, 1037 (9th Cir. 2013).

district court's Rule 50 decision. However, Krechman's arguments identify conduct that is worrisome enough that it warrants some mention.

"A judge's participation justifies a new trial . . . if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988). Here, the district judge conducted the trial in a way that could evidence that he was biased in favor of the defendant police officers, and could have given the jury the impression that he lacked impartiality.

Outside of the juror's presence and before submitting the case to the jury, the district court indicated that it had prejudged the case's outcome by telling counsel that he would "fix it" if the jury did not "get it right." In context, this statement implied that the "right" outcome would be for the jury to reach a defense verdict by rejecting the testimony by one of Krechman's experts.

Also in comments made without the jury present, the district judge relied on his own past, personal experience as a police officer to justify the Defendants' actions. He concluded that the loose handcuff on Appel's hand was a "weapon," because he had "been there." He also relied on his experience, having "been there" and "done [that]" to determine that the officers were in a "street fight" with Appel. Although the district court did not make such statements in front of jurors, such reliance on personal experience in deciding the case nevertheless exhibits a potential for personal favoritism toward the defendant police officers.

The record also shows that the jury could have "perceived an appearance of . . . partiality" based on comments the district court made with the jury present. *Laurins*, 857 F.2d at 537. Specifically, during voir dire, the district judge justified a police officer's inappropriate conduct toward a prospective juror's son. Responding to the court's inquiry as to whether any juror or a family member had previous "encounters with the criminal justice system," one juror responded that her son had been arrested when he was a senior in high school for failing to pay a traffic ticket. The juror reported that her son was very upset by the experience, because a police officer had told him "[O]h, my goodness, you are such a cutie boy, look at you, blonde with curly hair, green eyes, slender, they are going to love you so much [in jail], maybe I should get some Vaseline for you, you are going to need it."

After the juror related this encounter and indicated that it made her "very upset," the district judge asked her, "Has your son ever had another encounter with law enforcement since that event?" She answered, "No." The district judge then proceeded to tacitly approve the police officer's conduct, indicating to the juror that she should have "bought [the officer] a cup of coffee," because his statement to her son had "scared [him] straight." The court's unnecessary approval of such inappropriate comments by law enforcement could have signaled to the jury the district court's partiality to police officers.

The foregoing comments exhibit a disregard for the principle that, as a trial judge, the district judge "must be ever mindful of the sensitive role it plays in a jury trial and avoid *even the appearance* of advocacy or partiality." *United States v. Elder*, 309 F.3d 519, 524 (9th Cir. 2002) (emphasis added)

(quoting *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1990), *overruled on other grounds by Hunter v. Bryant*, 502 U.S. 224 (1991) (per curiam)).  Because the jury hung in this case, we cannot be certain that such comments by the district court did not affect the trial's outcome. Additionally, they bear no rational relationship to "controlling the conduct of [the] trial." *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 465 (9th Cir. 1987). Instead, they give the appearance that the district court was partial to the defense—a premise that aligns with the district court's conclusion that Defendants were entitled to judgment as a matter of law.

Although we do not reach the issue of whether the district court's conduct rose to a level that independently warrants a new trial, it certainly approached that line.