**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEIL O'BRIEN, an individual, *Plaintiff-Appellant*, | No. 13-16279 |
| v. | D.C. No. 1:12-cv-02017-AWI-SAB |
| JOHN WELTY, DR.; PAUL M. OLIARO, DR.; CAROLYN V. COON, DR.; VICTOR M. TORRES, DR.; MARIA A. LOPES, DR.; LUZ GONZALEZ, DR.; MATTHEW JENDIAN, DR., each in their personal capacities; DOES, 1 through 25, inclusive, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted
September 16, 2015—San Francisco, California

Filed April 7, 2016

Before: William A. Fletcher, Marsha S. Berzon,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's dismissal of a complaint for failure to state a claim, and remanded in an action brought by a California State University student who alleged that faculty members and administrators violated his constitutional rights, including those protected by the First Amendment, when they sanctioned him for violating the Student Conduct Code's prohibition on harassment and intimidation that poses a threat to others.

The panel held that California Code of Regulations, tit. 5, § 41301(b)(7), which authorizes branches of California State University to discipline students for conduct that "threatens or endangers the health or safety of any person . . . including . . . intimidation [or] harassment," was not unconstitutionally overbroad or vague. The panel further held that the regulation supported imposing discipline for plaintiff's conduct. However, the panel also held that plaintiff's complaint alleged sufficient facts to state a plausible First Amendment retaliation claim against some of the defendants.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Brian C. Leighton (argued), Law Offices of Brian C. Leighton, Clovis, California, for Plaintiff-Appellant.

Molly S. Murphy (argued), Deputy Attorney General; Kamala D. Harris, Attorney General of California; Kristin G. Hogue, Senior Assistant Attorney General; Joel A. Davis, Supervising Deputy Attorney General, Los Angeles, California, for Defendants-Appellees.

Eugene Volokh (argued), UCLA School of Law, Los Angeles, California, for Amici Curiae Student Press Law Center and the Foundation for Individual Rights in Education, Inc.

David J. Hacker and Heather Gebelin Hacker, Alliance Defending Freedom, Folsom, California; Kevin J. Theriot, Alliance Defending Freedom, Leawood, Kansas; Kevin T. Snider, Pacific Justice Institute, Sacramento, California, for Amici Curiae Trent Downes, Alliance Defending Freedom, and Pacific Justice Institute.

**OPINION**

W. FLETCHER, Circuit Judge:

At all times relevant to this suit, Neil O'Brien was a student at California State University Fresno ("Fresno State"), where he was an outspoken political conservative and critic of the university. In May 2011, O'Brien confronted and videotaped two professors in their offices, questioning them about a poem that had been published in a supplement to the student newspaper. After disciplinary proceedings, the university found that O'Brien had violated the Student Conduct Code's prohibition on harassment and intimidation that poses a threat to others. The university imposed sanctions. O'Brien brought suit in district court against several faculty members and administrators, alleging violations of his constitutional rights including those protected by the First Amendment. The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

We hold that California Code of Regulations, tit. 5, § 41301(b)(7), which authorizes branches of California State University to discipline students for conduct that "threatens or endangers the health or safety of any person . . . including . . . intimidation [or] harassment," is not unconstitutionally overbroad or vague. We hold, further, that the regulation supported imposing discipline for O'Brien's conduct. However, we also hold that O'Brien's complaint alleges sufficient facts to state a plausible First Amendment retaliation claim against some of the defendants. We therefore reverse in part and remand to the district court for further proceedings.

## I. Background

### A. Factual Allegations

The following narrative is based on allegations in O'Brien's First Amended Complaint ("FAC"). For present purposes, we assume that the allegations of fact and reasonably drawn inferences are true.

Plaintiff Neil O'Brien enrolled as a junior at Fresno State in the fall semester of 2010 to pursue a degree in recreation. O'Brien, who describes himself as a "constitutional conservative," quickly involved himself in political advocacy on campus. He formed the Fresno chapter of the student organization Young Americans for Liberty; he organized events for the Central Valley Tea Party; and he frequently attended student government meetings.

O'Brien soon became an outspoken critic of the Fresno State faculty and administration. He particularly objected to the university's support for the student body president, an undocumented immigrant, and to the administrators' endorsement of the DREAM Act. O'Brien began a website on which he posted information he had discovered about the student body president on the internet and through IRS records searches. He also posted criticism of Fresno State's separate graduation ceremony for Latino students. He filed public records requests to obtain information on administrator salaries and other issues, and he spoke up at student government meetings. He learned that his records requests were "reported all the way up to" then-university president Dr. John D. Welty.

In response to the activities just described, university officials monitored and interfered with O'Brien's activities. During O'Brien's first year at Fresno State, Dr. Carolyn Coon, Assistant Dean of Student Affairs, "requested that students and other faculty members gather information and complaints to use against" him. The director of alumni relations sent emails to other administrators, including the university's communications director, requesting that they "do something" about O'Brien and his website. In the fall of 2012, university officials deleted some of O'Brien's posts from Facebook pages that were "operated and managed by university officials" and "permanently block[ed] him from posting" about certain issues on the pages while, at the same time, allowing the posts of "pro-radical left-leaning view points in support of [the student body president] and other leftist posts to remain."

## 1. Videotaping Incident

In early May 2011, O'Brien read a poem in "La Voz de Aztlan," a supplement to the Fresno State student newspaper published by the Chicano and Latin American Studies ("CLS") Department. O'Brien objected to the ways in which the poem characterized the United States — including "'America the land robbed by the white savage,' the 'land of the biggest genocide,' the 'place of greed and slavery,' the 'rapist of the earth,' . . . [and] the 'land of the brute, the bully, the land of glorified killers, the eater of souls[.]'" On May 11, O'Brien went to the second floor of the social sciences building to confront Dr. Victor Torres, the faculty advisor for "La Voz" and a professor in the CLS Department. While waiting in the hallway outside Torres' office, O'Brien overheard Dr. Maria Lopes, another CLS professor, comment to Torres that O'Brien was "stalking" the hallway. Torres

said to Lopes that "the faculty should post 'wanted' signs with pictures of [O'Brien's] face on them to mock [him] and to serve as a warning to other students and faculty as to what [he] looked like and warn of [his] potential presence." After overhearing these comments, O'Brien decided to approach not only Dr. Torres but also Dr. Lopes.

O'Brien approached Dr. Torres' open office door, turned on his video camera, and asked Torres if he had approved of the publication of the poem. Torres refused to speak to him. O'Brien "calmly insisted on speaking to Torres about the poem." Torres then picked up the phone and called campus police. O'Brien next went to the open door of Dr. Lopes' office, with his video camera turned on, and asked her the same questions. She, too, refused to answer, stating that she did not want to talk to him. When O'Brien insisted, she closed her office door and called campus police. Torres and Lopes subsequently filed complaints with the Fresno State campus police. Dr. Luz Gonzalez, Dean of the Social Sciences Department (of which the CLS Department is a part), also filed a complaint with the campus police, even though she had not been present during the videotaping incident. O'Brien provided to the campus police a copy of the videotape he had made while confronting Torres and Lopes.

When Dr. Torres and Dr. Lopes later read the campus police report of the May 11 incident, they learned that "the Campus Police investigator had determined . . . that [O'Brien] was not threatening and intimidating." "Defendants Torres, Lopes and Gonzalez requested the Campus Police to rewrite the report to show that [O'Brien] was threatening and intimidating." The FAC does not specify whether the report was rewritten as requested, but we infer from other

allegations in the FAC that it was not. At the request of unspecified "Defendants," the campus police "report[ed] the matter" to the Fresno County District Attorney, but the District Attorney declined to prosecute.

The FAC alleges that on May 24 "[t]he Campus Police Department, now having reviewed the actual video tape of the incident contacted Defendants Torres and Lopes again to confront them about what they claimed [O'Brien] did and said, the length of time he was in each of their offices, and to let both Torres and Lopes know that the video tape of the incident showed that their previous claims were not accurate. Both refused to correct their false claims."

Also on May 24, Dean Coon mailed a letter to O'Brien informing him that he was facing disciplinary action. The letter stated that his actions on May 11 constituted conduct that "threatens or endangers the health, or safety . . . including physical abuse, threats, intimidation, harassment . . . ." The letter required him to attend a "judicial conference" or face a possible "disciplinary hold" on his record.

## 2. Disciplinary Proceedings

In response, O'Brien emailed Dean Coon, copying President Welty and campus police, "stating that Torres and Lopes' accusations were completely false," and stating that campus police had not contacted O'Brien to request a statement. O'Brien asked Coon to provide him with copies of "reports made by all students, staff, and administrators" about O'Brien. Coon initially agreed to provide such reports but later refused to do so. O'Brien requested that he be allowed to bring an attorney to the "judicial conference," and

that he be allowed to videotape and otherwise record the proceedings.

Dr. Paul Oliaro, Vice President for the Division of Student Affairs and Dean of Students, replied to O'Brien, stating that President Welty had asked him to respond. Oliaro wrote that pursuant to a "long-standing policy" of President Welty, attorneys were not permitted to participate in "judicial proceedings," but that O'Brien could bring a non-attorney advisor. Oliaro also wrote that O'Brien would not be allowed to record or videotape the judicial conference.

The judicial conference took place on June 17. O'Brien brought an attorney, but the attorney was not allowed to participate in the conference. O'Brien brought no other advisor. At the conference, Dean Coon offered O'Brien a settlement under which O'Brien would admit the allegations against him and would agree to sanctions restricting him from coming within 100 feet of CLS faculty, staff, and offices. O'Brien refused to sign the proposed settlement.

On August 26, Dean Coon sent O'Brien a letter stating that disciplinary charges had been filed. The letter charged him with violation of California Code of Regulations, tit. 5 § 41301(b)(7) ("Student Conduct Code"), which authorizes disciplinary sanctions for student conduct that "threatens or endangers the health or safety of any person . . . including physical abuse, threats, intimidation, harassment, or sexual misconduct." The letter detailed the procedures of a "judicial hearing" at which O'Brien could contest the charges. The letter stated that O'Brien could bring a non-attorney advisor, but not an attorney, to the hearing.

The judicial hearing was held on September 13. O'Brien's attorney was not permitted in the hearing room. The hearing officer was Mr. Marcus Freeman, who held unspecified positions in the Arts and Humanities Department and in the Human Resources Department. O'Brien again asked permission to record the proceedings, and was again refused. He asked to be provided a copy of the recording that was being made by the university, but was refused on the ground that the recording "was University property." Dean Coon was identified as the "investigator" at the hearing. Dr. Torres, Dr. Lopes, Dean Gonzalez and O'Brien all testified.

O'Brien asked Mr. Freeman, the hearing officer, to look at the videotape he had made during the May 11 incident, but Freeman refused to do so. O'Brien then sought to have campus police Detective Manucharyan, who had seen the video, testify about what it contained. O'Brien's attorney had interviewed Manucharyan, who had told the attorney that Dr. Torres and Dr. Lopes had not been "truthful" when they reported the May 11 incident to the campus police, and when they spoke to Manucharyan during his follow-up investigation. O'Brien's attorney was sitting with Manucharyan in the lobby, out of earshot of the hearing room. Dean Coon left the hearing room to call campus police. When she returned, she reported that an unidentified person at the police station had informed her that Manucharyan was "not available," and that "since the matter was an ongoing investigation, none of the officers or detectives would be able to come testify or comment on it." The FAC alleges that Manucharyan was "prepared to testify, but no one from Fresno State advised Defendant[] Coon or Freeman of that fact." The FAC is silent on the question why O'Brien did not inform Freeman that Manucharyan was outside the hearing room and was prepared to testify.

On September 30, 2011, after having received a report from Mr. Freeman recommending disciplinary sanctions against O'Brien, Vice President Oliaro rendered a final, non-appealable decision finding that O'Brien had violated the Student Conduct Code.  Oliaro concluded that Dr. Torres and Dr. Lopes could reasonably have found O'Brien's behavior to be "intimidating and harassing and were concerned for their safety."  Oliaro had not provided a copy of Freeman's report and recommendation to O'Brien prior to reaching his decision.  According to the FAC, Freeman's report was "replete with inaccuracies and blatant manipulation of the 'evidence.'"

Vice President Oliaro imposed two sanctions:  First, O'Brien was prohibited from coming within 100 feet of CLS faculty, staff, offices, or classrooms, or from coming onto the second floor of the social sciences building, "unless [he had] prescheduled business, a class, or an appointment."  Second, O'Brien was placed on "disciplinary probation" through the spring 2012 semester.  Mr. Freeman had not recommended this second sanction.  As a consequence of the probationary status imposed by Oliaro, O'Brien was prohibited by university rule from being president or treasurer of the campus chapter of Young Americans for Liberty, and from holding any position in student government.

### 3.  Further Incidents

O'Brien was involved in two further incidents involving the Fresno State faculty and campus police.  First, on December 1 and 2, 2011, after the stay-away sanction had been imposed, O'Brien returned to the social sciences building to evaluate the building for compliance with the Americans with Disabilities Act (ADA), as part of a class

assignment. He was confronted on both days by Dean Gonzalez and other faculty members.

On the first day, Dean Gonzalez confronted O'Brien and told him that he was not allowed in the building. O'Brien told Gonzalez that he had a class assignment and that he was therefore permitted to be in the building. Gonzalez called the campus police. After the police arrived, they followed O'Brien for about 15 to 20 minutes as he worked on the assignment. Because of the delays occasioned by Dean Gonzalez's calling the campus police, O'Brien was unable to complete the assignment.

On the second day, O'Brien came back to complete the assignment, this time bringing his video camera with him. Dean Gonzalez "again loudly confronted [O'Brien], scolding him that he was not permitted to be there." Another faculty member in the sociology department, Dr. Matthew Jendian, "loudly confronted" and then "confronted and pursued" O'Brien as he was videotaping. The confrontation intensified nearly to the point of physical violence. According to the FAC, O'Brien continuously backed away from Jendian as he was attempting to videotape the encounter. Gonzalez again requested campus police. Jendian reported to the police that O'Brien had been the aggressor in the confrontation. As a result of Gonzalez's claim that O'Brien was not allowed in the building, campus police detained O'Brien until his attorney arrived at the police station. After campus police saw a copy of the stay-away order and an email from O'Brien's professor describing his assignment and authorizing his presence in the building, they released O'Brien. Vice President Oliaro afterwards informed O'Brien that his presence in the building to work on his class assignment had not violated his probation. However, "to

avoid confusion in the future," Oliaro told O'Brien that going forward he "expect[ed]" him to notify Dean Gonzalez's office at least 24 hours before entering the building.

Second, in spring semester 2012 O'Brien enrolled in two courses that met on the second floor of the social sciences building. O'Brien's attorney contacted the campus police ahead of time to inform them that O'Brien would be attending classes in the building. On the first day of the semester, O'Brien arrived early for class and sat down to eat lunch at a table at the end of the second-floor hallway, near the CLS department offices, where early-arriving students often ate and chatted before class. As he sat down, a CLS professor told him that he was not allowed in that hallway. The professor informed Dean Gonzalez and the campus police. Several days later Vice President Oliaro contacted O'Brien by email to reiterate that he was not to be within 100 feet of CLS offices or faculty unless he was attending class or on other authorized business.

## B. District Court Proceedings

O'Brien filed suit in state court alleging violations of his constitutional rights, naming as defendants President Welty, Vice President Oliaro, Dean Coon, Dean Gonzalez, Dr. Torres, Dr. Lopes, Dr. Jendian, and 25 other unknown faculty and campus law enforcement officers (collectively "defendants"). Defendants removed to federal court. O'Brien filed the operative FAC in federal court, alleging violations of specific constitutional rights by specific defendants under 42 U.S.C. § 1983, and a conspiracy to violate his constitutional rights under § 1985. In particular, he alleged that defendants imposed discipline under an unconstitutionally overbroad and vague regulation, that they

imposed discipline for having engaged in speech and conduct protected by the First Amendment, that they retaliated against him for having engaged in protected speech and conduct, and that they violated his right to equal protection, procedural due process, freedom from unreasonable search and seizure, free association, right to travel, and right to petition for grievances. The videotape made by O'Brien on May 11 was not attached to the FAC or otherwise made part of the record.

The district court granted defendants' motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Relying on the "public forum" doctrine, the district court held that the social sciences building was a non-public forum, and that Fresno State could therefore enforce a content-neutral regulation on speech. The court held that O'Brien's confrontation of Dr. Torres and Dr. Lopes in their offices on May 11 could reasonably have been perceived to be harassment and intimidation within the meaning of the regulation. The district court further held that the complaint did not allege facts sufficient to show that the professors' complaints, the disciplinary hearing, or the later emails clarifying the sanctions were motivated by retaliation for the content of O'Brien's speech rather than O'Brien's violation of the regulation. The court rejected O'Brien's other constitutional claims. Finally, the court held that because there had been no constitutional violation, defendants were entitled to qualified immunity.

On appeal, O'Brien contests the district court's dismissal of his First Amendment claims. O'Brien is joined by amici, who argue that California Code of Regulations, tit. 5, § 41301(b)(7) is unconstitutionally vague and overbroad both facially and as applied to O'Brien.

We reject O'Brien's facial and as-applied First Amendment challenges to the regulation. However, we hold that O'Brien has alleged sufficient facts showing retaliation for protected speech to survive a motion to dismiss. O'Brien's other constitutional claims are waived for failure to argue them sufficiently on appeal.

## II.  Standard of Review

This Court reviews *de novo* the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007).

## III.  Harassment and Intimidation

We begin by considering O'Brien's First Amendment challenge to Fresno State's decision that he violated the Student Conduct Code, as codified in state regulations. Section 41301(b)(7) of Title 5 of the California Code of Regulations authorizes branches of the California State University to impose discipline for "[c]onduct that threatens or endangers the health or safety of any person within or related to the University community, including physical abuse, threats, intimidation, harassment, or sexual misconduct." Vice President Oliaro found, on behalf of Fresno State, that O'Brien violated this regulation when he confronted Dr. Torres and Dr. Lopes in their offices with his video camera. O'Brien challenges this decision on two grounds. First, he contends that the regulation on its face violates the First Amendment because it is overbroad and vague. Second, he contends that the university's application of the regulation punished him for engaging in speech and speech-related conduct protected by the First Amendment.

### A.  Overbreadth and Vagueness

Under the "substantial overbreadth" doctrine, a statute or regulation may be facially invalid under the First Amendment if there is a "realistic danger" that it will "significantly compromise recognized First Amendment protections of parties not before the Court." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (internal quotation marks omitted).  In other words, a regulation imposing lawful limits on some expressive activities may nevertheless be invalid if at the same time it "reaches too much expression that is protected by the Constitution." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008).

A regulation may also violate the First Amendment if it is unconstitutionally vague. To pass muster, a regulation must "allow persons of 'ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Three rationales underlie the void-for-vagueness doctrine: (1) individuals should not be punished for behavior they could not have known was illegal; (2) vague laws allow arbitrary and discriminatory enforcement; and (3) vague laws may have a chilling effect on free speech.  *See Grayned*, 408 U.S. at 108–09; *Foti*, 146 F.3d at 638.

O'Brien challenges § 41301(b)(7) on the ground that it is both overbroad and vague.  He argues that the terms "intimidation" and "harassment" involve subjective determinations that turn on whether a particular individual finds the conduct to be intimidating or harassing.  Thus, he argues, conduct that is "offensive" but protected under the First Amendment is covered by the regulation.  Further, amici

point out that "harassment" is defined differently in various California laws and California State University policies. They argue that these varying definitions give administrators wide latitude to enforce the regulation arbitrarily or to use enforcement proceedings to silence disfavored speech.

We rejected similar arguments in *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014). In *Osinger*, we held that "because 18 U.S.C. § 2261A [the federal stalking statute], proscribes harassing and intimidating conduct, the statute is not facially invalid under the First Amendment." 753 F.3d at 944. We noted that "harass" "[is] not [an] esoteric or complicated term[] devoid of common understanding." *Id.* at 945; *see also United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) ("'Harass' and 'intimidate' are not obscure words."), *cert. denied*, 133 S.Ct. 757 (2012). The fact that the terms may in some cases entail interpretation is not enough to sustain an overbreadth or vagueness challenge. *Osinger*, 753 F.3d at 943–45.

In the challenged regulation before us, the terms "harassment" and "intimidation" do not stand on their own. Section 41301(b)(7) prohibits only "harassment" or "intimidation" that "threatens or endangers the health or safety" of another in the university community. Cal. Code Regs., tit. 5, § 41301(b)(7); *see College Republicans v. Reed*, 523 F. Supp. 2d 1005, 1022–23 (N.D. Cal. 2007). This regulation is therefore narrower and more precise than the statute that was sustained in *Osinger*, as well as much narrower and more precise than university harassment policies that have been held overbroad by our sister circuits. *See DeJohn,* 537 F.3d at 316–17 (policy prohibited conduct which "had the purpose or effect of creating an . . . offensive environment"); *Dambrot v. Central Mich. Univ.*, 55 F.3d

1177, 1182 (6th Cir. 1995) (policy defined "harassment" as behavior that subjected another to "an intimidating, hostile, or offensive . . . environment"). Further, this circuit has recognized the needs of educational institutions to protect their employees and students from potentially harmful conduct. *See Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178 (9th Cir. 2006) (upholding discipline of student who wore homophobic t-shirt because it "injure[d] and intimidate[d]" others), *vacated on other grounds as moot*, 549 U.S. 1262 (2007). We therefore conclude that § 41301(b)(7) is neither unconstitutionally overbroad nor vague. Rather, it permissibly authorizes California State University branches to discipline students who engage in harassment or intimidation that threatens or endangers the health or safety of another person in the university community.

## B.  Protected Conduct

A regulation that is not facially overbroad or vague may nonetheless be unconstitutional as applied, in an individual case, to constitutionally protected speech. However, we conclude that the application of § 41301(b)(7) to O'Brien's confrontation of Dr. Torres and Dr. Lopes on May 11 did not violate the First Amendment. We agree with the district court that O'Brien has not alleged facts sufficient to show that the second floor hallway and offices of the social sciences building were public fora. *See Souders v. Lucero*, 196 F.3d 1040, 1044 (9th Cir. 1999) (holding that the outdoor space of a university was not a public forum); *see also Helms v. Zubaty*, 495 F.3d 252, 256–57 (6th Cir. 2007) (finding that "open-door policy" did not make county offices public fora). Therefore, the university could regulate speech and expressive conduct as long as the regulation was "reasonable"

and viewpoint neutral. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). It is clear from the text of § 41301(b)(7) that it is a viewpoint neutral regulation. It is also clear that § 41301(b)(7)'s authorization of discipline for conduct that "threatens or endangers the health or safety" of others in the university community is reasonable, as it is consistent with the university's interest in "preserving the property . . . for the use to which it is lawfully dedicated," *i.e.*, ensuring a safe context for learning and teaching. *See Perry*, 460 U.S. at 50–51.

Assuming the allegations in the FAC to be true, we also conclude that Fresno State's application of § 41301(b)(7) to O'Brien's conduct was reasonable. According to the FAC, on May 11 O'Brien, without an appointment,

> [A]pproached Defendant Torres' office door which was open. With video camera on, Plaintiff asked Torres if he had approved of the "America" "White Savage" poem published in that "La Voz" student newspaper. Defendant Torres refused to speak to Plaintiff. Nevertheless, Plaintiff calmly insisted on speaking to Torres about that poem. Defendant Torres' reaction was to pick up his telephone and call the Fresno State Campus Police. Plaintiff then left Defendant Torres' office . . . . Plaintiff then approached the open office door of Defendant Lopes and asked her the same series of questions, with his video camera running. She refused to answer the questions, and when Plaintiff asked again, Lopes stated that she did not

> want to talk to him.  She went to the door,
> closed it, and then called Campus Police.

The FAC alleges that Dr. Torres and Dr. Lopes both filed complaints with the Fresno State campus police stating that O'Brien was "threatening, was attempting to instigate a physical altercation, and that they felt threatened."  We may infer from the FAC that there was conflict in the testimony before the hearing officer, with Torres and Lopes, on the one hand, and O'Brien, on the other, differently characterizing their interactions on May 11.  After hearing the testimony, Mr. Freeman, the hearing officer, prepared a report finding that O'Brien had violated § 41301(b)(7) and recommending discipline.  Sustaining the hearing officer's findings, Vice President Oliaro concluded that Torres and Lopes "reasonably could find [O'Brien]'s behavior to be intimidating and harassing and were concerned for their safety."  In so concluding, Oliaro construed § 41301(b)(7) as forbidding conduct that could reasonably be understood as threatening, irrespective of the subjective intent on the part of O'Brien. *Compare Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015); *Virginia v. Black*, 538 U.S. 343, 359 (2003).

Taking the allegations in the FAC as true, we conclude that Freeman and Oliaro reached a permissible conclusion. Professors at work in their personal offices do not generally expect to be confronted without warning by a student asking hostile questions and videotaping.  If the uninvited student refuses to cease hostile questioning and refuses to leave a professor's personal office after being requested to do so, as O'Brien admits occurred here, the professor may reasonably become concerned for his or her safety.  O'Brien's behavior as described in the FAC could be considered "harassment" or "intimidation" and threatening under an objective

reasonableness standard. It was thus permissible for Fresno State to impose discipline on O'Brien for this conduct under its reasonable and viewpoint-neutral regulation.

## IV. Retaliation

Although we have determined that O'Brien could lawfully be subject to discipline for his actions, that does not end our inquiry. Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment. For example, in *Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006), we held that a plaintiff need not establish the absence of probable cause for a police officer's seizure of the plaintiff's personal property to make out a First Amendment retaliation claim. Therefore, though O'Brien was appropriately subject to discipline for his confrontation of Dr. Torres and Dr. Lopes, he may state a claim under § 1983 if his allegations, taken as true, could plausibly show that the defendants' actions in disciplining him were substantially motivated by his protected speech or expressive conduct.

There are three elements to a First Amendment retaliation claim, as we explained in *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006):

> [A] plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial

or motivating factor in the defendant's conduct.

*Id.* at 770 (citing *Mendocino Envt'l Cntr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).  Once a plaintiff has made such a showing, the burden shifts to the government to show that it "would have taken the same action even in the absence of the protected conduct."  *Id.* at 770 (internal citation and quotation marks omitted); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (establishing this framework in the public employee speech context).

We note here that the case before us does not implicate the Supreme Court's student speech doctrine as applied in the high school setting in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), which requires considering First Amendment rights "in light of the special characteristics of the school environment."  *Id.* at 266 (internal quotation marks omitted).  As we recently explained in *Oyama v. University of Hawai'i*, No. 13-16524, 2015 WL 9466535, at *7–9 (9th Cir. Dec. 19, 2015), we have not extended this doctrine to the university setting.  While *Pinard* arose in the context of public school student speech, the framework it uses for evaluating retaliation claims is neither drawn from nor limited to public school student speech cases, and is applicable here.

Applying the *Pinard* framework, the district court held that the FAC failed to state a plausible claim for retaliation under the First Amendment.  We disagree.

In ruling on a motion to dismiss under Rule 12(b)(6), we determine whether the complaint "contain[s] sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 US. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Judged under this standard, we hold that O'Brien's FAC plausibly supports a First Amendment retaliation claim.

First, O'Brien has alleged facts showing that he engaged in speech and conduct protected by the First Amendment in the months leading up to his May 11 confrontation with Dr. Torres and Dr. Lopes. For example, beginning in fall 2010, O'Brien posted on a website his opposition to the student government president and the school administration. He also made several public records requests to Fresno State. We agree with the district court that O'Brien's expression of his views, as described in his complaint, "qualifies as constitutionally protected activity" under the First Amendment. *See, e.g.*, *Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) (finding that the First Amendment protects blog posts equally to traditional journalism for purposes of defamation suits).

Second, defendants' actions in disciplining O'Brien would "chill a person of ordinary firmness" from engaging in these protected activities. *Pinard*, 467 F.3d at 770. The test is generic and objective. Whether O'Brien himself was, or would have been, chilled is not the test. *See Mendocino Envt'l Cntr.*, 192 F.3d at 1300. In *Pinard*, we held that suspension from extra-curricular activities "would lead ordinary student[s] . . . in the plaintiffs' position" to refrain from protected speech. *Pinard*, 467 F.3d at 771. Dr. Torres,

Dr. Lopes, Dean Gonzalez, and Dr. Jendian each made complaints to campus police regarding O'Brien. Dean Coon charged O'Brien with violating the Student Conduct Code and initiated disciplinary proceedings. After a hearing, Vice President Oliaro imposed sanctions, including disciplinary probation, that restricted O'Brien's access to parts of the campus and limited his involvement in student groups and student government. It is entirely plausible that a jury could find these actions "reasonably likely to deter [an ordinary person] from engaging in" protected speech and conduct. *See Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003).

Finally, the factual allegations in the FAC are sufficient to support a reasonable inference that defendants' actions were substantially motivated by O'Brien's protected speech prior to the May 11 videotaping incident. We disagree with the district court's conclusion that only "rank speculation" supported O'Brien's contention that the disciplinary proceedings and sanctions were retaliatory.

The FAC alleges that prior to May 11, as a result of O'Brien's political activities and his criticism of university faculty and administration, Dean Coon "requested that students and other faculty members gather information and complaints to use against" him. At least one student provided complaints and other documents to Coon pursuant to this request. Some of the defendants, as well as other faculty members, sent emails to President Welty, Vice President Oliaro, and Dean Coon, "demanding that [they] do something about [O'Brien]." The FAC is not clear as to the timing of these requests, but one may reasonably infer that they were made prior to May 11. In addition, at about the same time, the director of alumni relations sent emails to other administrators, including the university's communications

director, requesting that they "do something" about O'Brien and his website. On May 11 itself, before O'Brien sought to videotape Dr. Torres and Dr. Lopes in their offices, O'Brien overheard Lopes saying that O'Brien was "stalking" the hallway, and Torres saying that the faculty "should post 'wanted' signs with pictures of [O'Brien's] face on them to mock [him] and to serve as a warning to other students and faculty as to what [he] looked like and warn of [his] potential presence."

The FAC also alleges that at the disciplinary hearing on September 13, O'Brien was not given a full and fair opportunity to present his side of the story. The hearing officer refused to look at, or to allow O'Brien to show, the videotape of his encounters with Dr. Torres and Dr. Lopes even though O'Brien represented that the videotape would contradict Torres' and Lopes' accounts of what happened on May 11. Dean Coon made, at most, a half-hearted attempt to locate Detective Manucharyan, who was sitting in the lobby prepared to testify, and who would have testified about the contents of the videotape. And the university refused to allow O'Brien to record the proceedings, or to obtain a copy of the recording that the university made of the proceedings. We do not hold that O'Brien's due process rights were violated in the hearing; that question is not before us. But we do point out that the university, and several of the defendants, did not facilitate — and indeed impeded — O'Brien in his attempt to document and explain his side of the story.

Further, the hearing officer recommended only that O'Brien be sanctioned by a "stay-away" order, prohibiting him from coming within 100 feet of CLS faculty, staff, offices, or classrooms, or from coming onto the second floor of the social sciences building without prescheduled business,

a class, or an appointment. Vice President Oliaro *sua sponte* imposed an additional sanction, putting O'Brien on "disciplinary probation" through the spring 2012 semester. O'Brien had enrolled as a junior at Fresno State in the fall of 2010, so the probation status imposed by Oliaro would last for the anticipated duration of his time at the university. The consequence of O'Brien's probationary status was that, by university rule, he could not be the president or treasurer of the campus branch of Young Americans for Liberty, the political advocacy group that O'Brien himself had founded. Further, and also as a consequence of his probationary status, O'Brien could not hold a position in Fresno State student government. In other words, the sanction added by Oliaro *sua sponte*, above and beyond the sanction recommended by the hearing officer, took direct aim at O'Brien's political activities on campus and forbade him from engaging in such activities for the remainder of his anticipated time at Fresno State.

The FAC alleges, finally, that after sanctions were imposed, university officials continued to impede O'Brien in various ways. On December 2, 2011, Dr. Gonzalez called campus police when O'Brien was in the social sciences building even though she had been informed the previous day that he was in the building pursuant to a class assignment. O'Brien was detained by the campus police and was released only after his attorney came to the police station with a copy of the stay-away order and an email from O'Brien's professor describing the assignment that permitted him to be in the building. Further, in the fall of 2012 university officials deleted posts made by O'Brien on university-managed Facebook pages, permanently blocking him from posting about certain issues, while at the same time allowing posts expressing left-leaning viewpoints to remain.

Considered together, the foregoing is enough to support the claim that O'Brien's "protected activity was a substantial or motivating factor in the defendant[s'] conduct" in conducting disciplinary proceedings and imposing sanctions. *Pinard*, 467 F.3d at 770. The events leading up to and including the hearing and imposition of sanctions are the most strongly probative of defendants' motivation. But events after the imposition of sanctions have some relevance, for they may plausibly be understood to show a continuation of animosity toward the conservative point of view articulated by O'Brien, as well as toward O'Brien himself. If O'Brien can establish the facts alleged, the burden would shift to the defendants, who can avoid liability if they can show that they "would have taken the same action even in the absence of the protected conduct." *Id.*

O'Brien named seven defendants in this case. We hold that the FAC states a First Amendment retaliation claim against five of them — Vice President Oliaro, Dean Coon, Dean Gonzalez, Dr. Torres and Dr. Lopes. We hold that the FAC has not alleged sufficient facts to state a claim against the remaining two — President Welty and Dr. Jendian — who were essentially peripheral figures with insufficient connection to the critical events to be held responsible for actions taken against O'Brien.

We caution against overreading our opinion. The First Amendment does not give a free pass to students who violate university rules simply because they can plausibly show that faculty or administrators disapprove of their political views. Our holding is by no means intended to disable university faculty and administrators from imposing discipline on students whose misconduct is preceded by or accompanied by the expression of opinions with which faculty members or

administrators strongly disagree. Specifically, our holding is by no means intended to protect from discipline students whose speech or conduct may reasonably be seen as threatening or constituting a danger to members of the university community. Indeed, as we have indicated above, O'Brien's conduct in the videotaping incident in this case was appropriately subject to discipline. The only issue in dispute is whether defendants imposed that discipline as retaliation for O'Brien's protected activity.

We hold that a retaliation claim has been stated because the allegations of the FAC, if believed, could reasonably support a conclusion that faculty members and administrators at Fresno State not only disagreed with the expressed political views of O'Brien, but also sought to punish and muzzle him in retaliation for his expression of those views. That is, if the facts alleged in the FAC are believed, a reasonable jury could conclude that defendants sought to punish O'Brien for his expression of his opinions, and to deter and even prevent him from engaging in speech and conduct protected by the First Amendment. In sum, the allegations in the FAC make it at least "plausible" that defendants' actions were substantially motivated by opposition to O'Brien's protected speech and expressive conduct. *See Twombly*, 550 U.S. at 570; *cf. Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001) (suggesting that evidence that defendants knew of plaintiff's protected speech and expressed opposition to it can create a genuine dispute of material fact on retaliatory motive to survive summary judgment). We reiterate that on remand, even if O'Brien can establish the facts in the complaint, the defendants may avoid liability if they can show that they would have taken the same disciplinary actions in the absence of O'Brien's protected activity. *See Pinard*, 467 F.3d at 770.

## V.  Qualified Immunity

The district court held that because defendants had not violated any of O'Brien's constitutional rights, they were necessarily entitled to qualified immunity.  The district court did not need to reach the question of qualified immunity, given its conclusion that defendants had not violated the Constitution.   By contrast, on the assumption that the allegations of the FAC are true we have held that O'Brien has stated a claim for retaliation, and the question of qualified immunity is therefore before us.

"Qualified immunity is an affirmative defense that must be raised by a defendant."  *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001).  When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies." *Id.*

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010) (citation and internal quotation marks omitted).  In this case, the district court held that qualified immunity shielded defendants from suit because the FAC "fail[ed] to set forth facts to show that any constitutionally protected right was infringed by any Defendant at any time."   As explained above, we disagree

with the district court and hold that the FAC pleads a plausible First Amendment retaliation claim.

The constitutional right to be free from retaliation was "clearly established at the time of defendants' actions." *Krainski*, 616 F.3d at 969 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Retaliation for engaging in protected speech has long been prohibited by the First Amendment. *See, e.g.*, *Pinard*, 467 F.3d at 770. We have previously made it clear that there is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action. *Id.*; *Skoog*, 469 F.3d at 1235. A reasonable official in defendants' shoes would thus have known that taking disciplinary action against O'Brien in retaliation for the expression of his views violated his First Amendment rights.

Our denial of qualified immunity at this stage of the proceedings does not mean that this case must go to trial. Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity.

## VI. Reassignment

O'Brien urges us to reassign the case to a different district judge on remand. We reassign only in "rare and extraordinary circumstances." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (internal citation and quotation marks omitted). We believe reassignment is not warranted. Though the district judge made an error of law, we have "no reason to believe that [he] would be unable fairly and correctly" to oversee further proceedings on remand. *Id*.

Conclusion

We affirm the district court in part, holding that California Code of Regulations, tit. 5, § 41301(b)(7) does not violate the First Amendment, either on its face or as applied in this case. However, we reverse in part, holding that O'Brien has alleged facts supporting his First Amendment retaliation claim that are sufficient to survive a motion to dismiss under Rule 12(b)(6) as to five of the seven defendants. We also reverse the district court's conclusion that these defendants are, at this stage of the proceedings, entitled to qualified immunity. Finally, O'Brien has not made more than a "bare assertion" of his other constitutional claims in either his opening or reply brief, and therefore any challenge to the district court's dismissal of these claims is waived. *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994). Each side is to bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**