**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIA SAMPSON,
  *Plaintiff-Appellant*,

v.

COUNTY OF LOS ANGELES, by and
through the Los Angeles County
Department of Children and Family
Services; NICOLE DAVIS; AHMED
OBAKHUME; DAWNA YOKOYAMA;
GERALDO IBARRA,
  *Defendants-Appellees.*

No. 18-55450

D.C. No.
5:17-cv-00599-
PA-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted November 8, 2019
Pasadena, California

Filed September 9, 2020

Before: Mary H. Murguia and Andrew D. Hurwitz, Circuit
Judges, and Jack Zouhary,[*] District Judge.

---

[*] The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

Opinion by Judge Murguia;
Partial Concurrence and Partial Dissent by Judge Hurwitz;
Partial Concurrence and Partial Dissent by Judge Zouhary

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and vacated in part the district court's order dismissing a complaint on qualified immunity grounds, and remanded, in an action brought pursuant to 42 U.S.C. § 1983 against the Los Angeles County Department of Children and Family Services and four individual employees alleging sexual harassment in violation of the Equal Protection Clause of the Fourteenth Amendment, retaliation under the First Amendment, and related constitutional claims.

The panel first vacated the district court's grant of qualified immunity to defendants on plaintiff's First Amendment retaliation claim. The panel held that it was clearly established at the time of defendants' conduct that the First Amendment prohibits public officials from threatening to remove a child from an individual's custody to chill protected speech out of retaliatory animus for such speech. Defendants therefore should have known that it was unconstitutional to retaliate against plaintiff for speaking out about the sexual harassment she allegedly suffered. The panel remanded to the district court for it to determine in the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

first instance whether plaintiff plausibly alleged a retaliation claim under the First Amendment.

The panel reluctantly affirmed the district court's grant of qualified immunity to defendants on plaintiff's equal protection claim because the right of private individuals to be free from sexual harassment at the hands of social workers was not clearly established at the time of defendants' conduct in this case. Nevertheless, moving forward, the panel explicitly held that public officials, including social workers, violate the Equal Protection Clause of the Fourteenth Amendment when they sexually harass private individuals while providing them social services.

Concurring in part and dissenting in part, Judge Hurwitz agreed with Judge Murguia that the qualified immunity doctrine, however ill-conceived, barred plaintiff's otherwise plausible equal protection claim, and therefore concurred in Section IV.B of the majority opinion. Judge Hurwitz dissented from Section IV.A of the opinion, stating that on the issue of whether defendants were entitled to qualified immunity on the First Amendment claim, there was no sufficiently similar binding precedent at the time of the conduct at issue that would have warned the alleged violators that their actions were constitutionally forbidden.

Concurring in part and dissenting in part, District Judge Zouhary agreed with Judge Murguia that the application of qualified immunity was improper with respect to the First Amendment claim. He stated that when the conduct at issue took place, it was clearly established that public officials may not threaten to remove a child from an individual's custody in retaliation for protected speech. He therefore joined in Section IV.A of the opinion. As for the Equal

Protection claim, Judge Zouhary agreed that defendants' alleged actions violated plaintiff's constitutional right to be free of sexual harassment. However, he disagreed that this right was not yet clearly established, and therefore he dissented from Section IV.B of the opinion.

## COUNSEL

Andre L. Clark (argued), Law Office of Andre Clark, San Bernardino, California; Daniel C. Sharpe, Law Offices of Vincent W. Davis & Assoc., Arcadia, California, for Plaintiff-Appellant.

Jaime Verducci (argued), David J. Weiss, and Michael H. Foman, Law Offices of David J. Weiss, Los Angeles, California, for Defendants-Appellees.

## OPINION

MURGUIA, Circuit Judge:

Natia Sampson volunteered to become the legal guardian of her niece, H.S., after her parents were incarcerated. Sampson alleges that throughout the process of applying for and obtaining legal guardianship of H.S., she was sexually harassed by a social worker assigned to her case; when Sampson complained about the harassment, the social worker and his supervisors allegedly retaliated against her.

Sampson sued the Los Angeles County Department of Children and Family Services ("DCFS") and four individual employees thereof (collectively, "Defendants") under 42 U.S.C. § 1983, alleging sexual harassment in violation of

the Equal Protection Clause of the Fourteenth Amendment, retaliation under the First Amendment, and other related constitutional claims.  The district court granted qualified immunity to Defendants on the Fourteenth Amendment sexual harassment and First Amendment retaliation claims and dismissed all other claims.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and vacate in part.  We vacate the district court's grant of qualified immunity to Defendants on Sampson's First Amendment retaliation claim because it was clearly established at the time of Defendants' conduct that the First Amendment prohibits public officials from threatening to remove a child from an individual's custody to chill protected speech out of retaliatory animus for such speech.  In other words, Defendants should have known that it was unconstitutional to retaliate against Sampson for speaking out about the sexual harassment she allegedly suffered.

We reluctantly affirm, however, the district court's grant of qualified immunity to Defendants on Sampson's equal protection claim because the right of private individuals to be free from sexual harassment at the hands of social workers was not clearly established at the time of Defendants' conduct in this case.  Nevertheless, moving forward, we explicitly hold that public officials, including social workers, violate the Equal Protection Clause of the Fourteenth Amendment when they sexually harass private individuals while providing them social services.  The Equal Protection Clause protects all of us from sexual harassment at the hands of public officials who are supposed to serve us.  This is especially true for vulnerable individuals like Sampson, who availed herself of the State's social services to become H.S.'s permanent legal guardian to protect her

niece from being placed in the State's foster care system.  To hold otherwise would be contrary to the Constitution's guarantee of equal protection under the law.

## I.  Factual Background

Sampson alleged the following facts, which we take as true in this appeal from the district court's order dismissing the operative complaint.  *See Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).  Sampson is a paternal aunt of minor H.S.  During the summer of 2014, Sampson learned H.S.'s parents had been incarcerated, resulting in the placement of H.S. in foster care.  After contacting DCFS about H.S., Sampson moved from Nevada to San Bernardino County, California, to be H.S.'s caregiver.  In November 2014, the Los Angeles County juvenile dependency court ordered H.S. to be placed in Sampson's care pending Sampson's guardianship application.

DCFS assigned Ahmed Obakhume, a social worker at its "Vermont Corridor" office, to H.S.'s case.  Obakhume commented on Sampson's appearance and marital status, urging her to end her marriage, inappropriately touching her, and attempting to coerce her into riding in his vehicle.  Sampson did not initially report Obakhume's conduct, fearing it would negatively impact her case.  In February 2015, however, after several months of unwanted advances, Sampson complained about Obakhume's conduct to his supervisor, Nicole Davis, who replied that Obakhume was "one of her best" social workers and the only one willing to work with H.S.'s biological parents.  Obakhume's conduct continued.

Throughout 2015, Sampson experienced two other issues in dealing with DCFS officials.  First, DCFS required Sampson to supervise visits between H.S. and the biological

parents. Sampson expressed her unwillingness to do so to Kilene Short—another Vermont Corridor social worker briefly assigned to H.S.'s case—but Short refused to remedy the situation. Second, Sampson had difficulties obtaining the additional "F-Rate" funding[1] for caregivers of children with special needs, for which Sampson claimed she was eligible. DCFS officials failed to provide the proper F-Rate paperwork, clothing allowances, and other reimbursements to Sampson. Obakhume also failed to advise Sampson that completing a class was required to qualify for F-Rate funding, and even after Sampson completed the class, Obakhume continued to incorrectly tell her there were other unsatisfied requirements.

In August 2015, the juvenile court granted Sampson legal guardianship of H.S. at the request of both biological parents. A month later, Geraldo Ibarra, Deputy Director of DCFS, assured Sampson he would remedy the F-Rate funding issue, assign H.S. another social worker, and address Obakhume's conduct.

In October 2015, Sampson allowed Ronald Sampson, her brother and H.S.'s father, to visit H.S. unsupervised, based on Obakhume's representation that Ronald had unmonitored visitation rights. Ronald then absconded with H.S., who was found the following day unclothed and hungry. Obakhume visited Sampson's residence to discuss the incident and stated, "I don't know where you get off sending all these complaint emails and making all these

---

[1] The Specialized Care Increment F-Rate is a higher foster care rate paid in addition to the basic foster care rate by Los Angeles County to foster caregivers of children with medical problems, physical conditions, or developmental disabilities/delays. *See Specialized Care Increment (SCI) – F Rate*, http://policy.dcfs.lacounty.gov/content/Specialized_Care_Increme.htm (last visited August 6, 2020).

calls, but you are going to find out that we at the Vermont Corridor stick together, and cover for each other.  No one is going to lose their job behind you and your mess."  Sampson immediately contacted Ibarra, who said he would intervene, but never did.

The next month, with Davis' permission, Obakhume filed unsupported allegations that Sampson was neglecting and abusing H.S., prompting a county child protective services investigator to visit Sampson's home on November 10 and 12.  That week, Sampson emailed Dawna Yokoyama, Assistant Regional Administrator of DCFS, to complain about Obakhume's sexual harassment and DCFS's false accusations of abuse and neglect.  Sampson then took H.S. to Nevada for Thanksgiving.  Meanwhile, DCFS petitioned for, and received, a warrant authorizing the removal of H.S. from Sampson's care; however, the warrant was never executed and soon expired.

After the expired warrant, DCFS sought an order from the juvenile court to remove H.S. from Sampson's care, again alleging, without justification, that Sampson was abusing and neglecting H.S.  The court held a hearing on December 9, 2015, at which Sampson successfully opposed DCFS's request to remove H.S. because DCFS could not show that Sampson was abusing or neglecting H.S. Nonetheless, DCFS was so determined to remove H.S. from Sampson's care that it filed a petition for an extraordinary writ with the California Court of Appeal requesting a stay of the juvenile court's order.  The court of appeal granted the petition and authorized DCFS to remove H.S. pending briefing; DCFS removed H.S. two days later. On January 7, 2016, after reviewing the merits of DCFS's petition, the California Court of Appeal vacated its stay order and returned H.S. to Sampson's care, realizing that DCFS's

allegations of abuse and neglect leveled against Sampson were unfounded.

H.S.'s juvenile dependency case was transferred to San Bernardino County in June 2016, and closed in February 2017.  Sampson remains H.S.'s legal guardian.

## II.  Procedural History

Sampson brought this action in July 2017; her first amended complaint alleged five claims against the County, Obakhume, Davis, Yokoyama, and Ibarra under 42 U.S.C. § 1983:[2]  (1) retaliation in violation of the First Amendment for falsely accusing Sampson of abuse and neglect and seeking to remove H.S. from her custody; (2) sexual harassment in violation of the Equal Protection Clause of the Fourteenth Amendment for Obakhume's conduct; (3) violation of substantive due process under the Fourteenth Amendment for judicial deception; (4) denial of procedural due process under the Fourteenth Amendment; and (5) liability against the County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The district court dismissed the first four claims without leave to amend on qualified immunity grounds and the *Monell* claim under Federal Rule of Civil Procedure 12(b)(6).  The district court applied qualified immunity because it found that Sampson had no protected interest to support her substantive and procedural due process claims, and the rights asserted in her First Amendment retaliation and Equal Protection sexual harassment claims were not "clearly established."  After granting Sampson two

---

[2] Short was also named as a defendant but was dismissed for Sampson's failure to prosecute and comply with a district court order.

opportunities to amend her *Monell* claim, the district court dismissed that claim with prejudice and entered a final judgment.

On appeal, Sampson challenges only the district court's dismissal based on qualified immunity of her Fourteenth Amendment equal protection and First Amendment retaliation claims.

## III.    Standard of Review

"We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6), accepting as true all allegations of fact in a well-pleaded complaint and construing those facts in the light most favorable to the plaintiff." *Karam v. City of Burbank*, 352 F.3d 1188, 1192 (9th Cir. 2003). "We review de novo a district court's decision on qualified immunity." *Vazquez v. County of Kern*, 949 F.3d 1153, 1159 (9th Cir. 2020).

## IV.    Analysis

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see* 42 U.S.C. § 1983. In order to state a claim under § 1983, a plaintiff must plausibly allege that "she suffered the deprivation of a federally protected right  and that 'the alleged deprivation was committed by a person acting under color of state law.'" *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1140 (9th Cir. 2020) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

In § 1983 actions, "qualified immunity protects government officials 'from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Kisela v. Hughes* ("*Kisela II*"), 138 S. Ct. 1148, 1152 (2018) (per curiam).  To determine whether qualified immunity applies, we ask whether (1) the plaintiff has plausibly alleged a violation of a constitutional right, and (2) the constitutional right was "clearly established" at the time of the conduct at issue.  *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Pearson*, 555 U.S. at 236).  Lower courts have discretion to address the questions in reverse order, *see Pearson*, 555 U.S. at 236, 242, and the district court did so here, taking up only the "clearly established" prong.

A constitutional right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right" at the time of his conduct.  *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Therefore, we ask "whether the state of the law [at the time of the officials' conduct] gave [them] fair warning that their alleged [conduct] was unconstitutional."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  In other words, because we focus "on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."  *Kisela II*, 138 S. Ct. at 1152 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Barkes*, 575 U.S. at 822 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "[O]fficials can still be on notice that their conduct violates established law even in novel factual

circumstances" where there are no prior cases with "fundamentally similar" or "materially similar" facts. *Hope*, 536 U.S. at 741.

### A.  First Amendment retaliation claim.

To state a First Amendment retaliation claim, Sampson must plausibly allege that (1) she engaged in a constitutionally protected activity, (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in Defendants' conduct. *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).   To prevail, Sampson must establish that Defendants' "retaliatory animus" was the "but-for" cause of her injury, "meaning that the adverse action against [her] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (first two quoting *Hartman v. Moore*, 547 U.S. 250, 259, 260 (2006)).   In other words, Sampson must show that Defendants' false accusations of abuse and neglect and their efforts to remove H.S. from her custody were motivated by their desire to retaliate against her for speaking out about Obakhume's sexual harassment.

Sampson alleged that she engaged in constitutionally protected activity when she complained about Obakhume's sexual harassment, Davis and Short's refusal to process her F-Rate funding paperwork, and Davis and Short's demands that Sampson monitor visits with H.S.'s biological parents. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256; *see Capp v. County of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019) ("It is well settled that the activity for which [the plaintiff]

was allegedly retaliated against—voicing criticism of the Agency's conduct—is constitutionally protected."). Clearly, Sampson's complaints about DCFS and its employees are constitutionally protected.

Sampson also alleges that, in retaliation for her complaints, Defendants withheld reimbursement funds, refused to communicate the requirements and procedures for those funds, falsely accused her of failing to comply with home visit requirements, demanded that she arrange and supervise visits with H.S.'s parents, and falsely accused her of abusing and neglecting H.S., ultimately filing a baseless action in state juvenile court to remove H.S. from her custody. The district court granted Defendants qualified immunity, finding no binding case law clearly establishing that public officials outside of the law enforcement, prison, employment, or school contexts can be liable for retaliation under the First Amendment. We disagree.

It was clearly established at the time of Defendants' conduct that the First Amendment prohibits public officials from threatening to remove a child from an individual's custody to chill protected speech out of retaliatory animus for such speech. *See Capp*, 940 F.3d at 1058–59.

In *Capp*, we denied qualified immunity to a social worker because "[a] reasonable official would have known that taking the serious step of threatening to terminate a parent's custody of his children, when the official would not have taken this step absent her retaliatory intent, violates the First Amendment." *Id.* at 1059. There, after a father complained about an allegedly unfounded child welfare services investigation, the social worker assigned to his case allegedly retaliated against the father by convincing his children's mother to file a baseless ex-parte motion for custody. *Id.* at 1050–52.

*Capp* is indistinguishable from the instant case.  Here, too, Defendants knew or should have known that taking the serious steps of falsely accusing Sampson of neglect and abuse and convincing the juvenile court to temporarily remove H.S. from her custody, when Defendants would not have taken these steps absent their retaliatory intent, violates the First Amendment.  Although *Capp* was decided in 2019, it held that the right at issue was clearly established by August 2015.  *Id.* at 1051, 1059.  Therefore, under *Capp*, Sampson's First Amendment right was clearly established on November 2015—the relevant date here.[3]

Defendants argue that *Capp* is distinguishable because it involves a biological parent.  The fact that Sampson is H.S.'s court-appointed legal guardian, rather than her biological parent, does not mean that Defendants could have reasonably understood that threatening to remove H.S. from her custody in retaliation for her protected activity did not

---

[3] Judge Hurwitz's partial dissent argues that we may not draw this conclusion in light of the Supreme Court's decision in *Kisela II*, which reversed our denial of qualified immunity in *Hughes v. Kisela* ("*Kisela I*"), 862 F.3d 775 (9th Cir. 2016).  *Kisela I* implicated conduct that occurred in 2010, and we similarly cited to a 2011 case that involved conduct from 2006.  *See Kisela I*, 862 F.3d at 783 (citing *Glenn v. Washington County*, 673 F.3d 864, 879–80 (9th Cir. 2011)).  But, critically, the 2011 case did not reach the clearly established prong of the qualified immunity analysis and said nothing about whether the right was clearly established prior to 2011.  *See Glenn*, 673 F.3d at 870.  In fact, our court in *Kisela I* relied on the 2011 case as "illustrative, not as indicative of the clearly established law in 2010," 862 F.3d at 783 n.2, and the Supreme Court reversed that decision based on the well-established principle that "a reasonable officer is not required to foresee judicial decisions that do not yet exist," *Kisela II*, 138 S. Ct. at 1154.  Here, unlike the 2011 case at issue in *Kisela I*, *Capp* explicitly held that the right to be free from retaliation in the form of threatened legal sanctions and other similar means of coercion and intimidation at issue here was clearly established as of August 2015.

violate the First Amendment.  *See Barkes*, 575 U.S. at 822.
To the contrary, *Capp* simply articulated, in the context of
social workers, what is a longstanding, clearly established
right under the First Amendment to be free from retaliation
in the form of threatened legal sanctions and other similar
means of coercion, persuasion, and intimidation.  *See
Mulligan*, 835 F.3d at 989 n.5 ("Informal measures, such as
'the threat of invoking legal sanctions and other means of
coercion, persuasion, and intimidation,' can violate the First
Amendment." (quoting *White*, 227 F.3d at 1228)); *Nieves*,
139 S. Ct. at 1772 ("'[A]s a general matter the First
Amendment prohibits government officials from subjecting
an individual to retaliatory actions' for engaging in protected
speech." (quoting *Hartman*, 547 U.S. at 256)); *Hartman*,
547 U.S. at 256 ("Official reprisal for protected speech
'offends the Constitution [because] it threatens to inhibit
exercise of the protected right,' and the law is settled that as
a general matter the First Amendment prohibits government
officials from subjecting an individual to retaliatory actions
. . . for speaking out." (quoting *Crawford-El v. Britton*,
523 U.S. 574, 588 n.10, 592 (1998))); *Perry v. Sindermann*,
408 U.S. 593, 597 (1972) (noting that the government may
not deprive a person of a benefit on the basis of her
"constitutionally protected speech"); *see also Austin v.
Terhune*, 367 F.3d 1167, 1170–71 (9th Cir. 2004) (holding
that prisoner stated a First Amendment retaliation claim
where he alleged that a guard exposed his genitalia to him
and the guard then filed a false disciplinary report against
him after he complained).  That clearly established right is
at issue with equal force in the instant case, where Sampson
alleges that Defendants used the threat of removing H.S.
from her custody to coerce, persuade, and intimidate her into
dropping her complaints of misconduct against them.  In
other words, *Perry*, *Nieves*, *Hartman*, and *Mulligan* clearly
establish that the threat of losing custody of a child would

ordinarily chill First Amendment activity of both biological parents and legal guardians alike.  *See O'Brien*, 818 F.3d at 933.  Therefore, because the same clearly established right at issue in *Capp* is also at issue here, the cases that supported denial of qualified immunity in *Capp* also compel us to deny qualified immunity in the instant case.[4]

Defendants also argue that they were on notice that they could not retaliate against parents—but not legal guardians—because we have held that biological parents have a clearly established due process right under the Fourteenth Amendment to be free from the deliberate use of perjured testimony and fabricated evidence during juvenile dependency proceedings.  *See, e.g.*, *Hardwick v. County of Orange*, 844 F.3d 1112, 1116–17 (9th Cir. 2017); *see also Greene v. Camreta*, 588 F.3d 1011, 1035 (9th Cir. 2009) (holding that "the 'constitutional right to be free from the knowing presentation of false or perjured evidence' is clearly established" (quoting *Devereaux v. Perez*, 218 F.3d 1045, 1055–56 (9th Cir. 2000))).   This argument is unavailing because *Hardwick* and *Greene* involve the Fourteenth Amendment's guarantee of due process, not the First Amendment's guarantee to be free from retaliation for protected speech.  These are two separate rights.  That is to say, even if we held that Sampson has no due process right

---

[4] Judge Hurwitz's partial dissent argues that, even assuming that a legal guardian is in a similar position as a biological or adoptive parent, *Capp* does not resolve this case because the cases *Capp* relied on defined the right at too high a level of generality.  But we must follow the reasoning in *Capp*—a factually indistinguishable and binding opinion from our court.  *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("[C]aselaw on point *is* the law.  If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.").

under the Fourteenth Amendment to be free from the deliberate use of perjured testimony and fabricated evidence,[5] she is still entitled to be free from retaliation under the First Amendment. *Hartman*, 547 U.S. at 256. *Hardwick* does not—indeed, it cannot—stand for the proposition that somehow biological parents have more of a right to be free from retaliation under the First Amendment than legal guardians, such that it was permissible for Defendants to think that it was constitutional to retaliate against a legal guardian but not against a biological parent.

In sum, because the First Amendment right to criticize official conduct of public officials without being subject to the threat of losing custody was "clearly established" as of August 2015, when the events of *Capp* took place, we hold that the same right was clearly established when Defendants sought and obtained a warrant to remove H.S. from Sampson's custody in November 2015. Therefore, we vacate the district court's grant of qualified immunity to Defendants on Sampson's § 1983 claim for retaliation under the First Amendment, since Defendants were not so entitled.

Because the district court did not address the other prong of the qualified immunity analysis, and the parties did not brief the issue on appeal, we remand this claim to the district court for it to determine in the first instance whether Sampson plausibly alleged a retaliation claim under the First Amendment. *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (declining to address the question

---

[5] Neither *Hardwick* nor *Greene* foreclose the possibility that we might hold in the future that permanent legal guardians like Sampson also have a due process right not to be confronted with perjured testimony or fabricated evidence.

of qualified immunity where the district court did not reach the issue).

## B.  Fourteenth Amendment sexual harassment claim.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)).

Although the Supreme Court has never explicitly considered whether sexual harassment violates the Equal Protection Clause, it has long recognized that sex-based discrimination by state actors that does not serve important governmental objectives and is not substantially related to the achievement of those objectives is unconstitutional. *See, e.g.*, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 146 (1994) (jury selection); *Davis v. Passman*, 442 U.S. 228, 234–36 & n.12 (1979) (employment discrimination); *Craig v. Boren*, 429 U.S. 190, 204 (1976) (legal drinking age); *Stanton v. Stanton*, 421 U.S. 7, 8–9, 17 (1975) (parental support obligations for sons and daughters); *Frontiero v. Richardson*, 411 U.S. 677, 678–79, 690–91 (1973) (entitlement to benefits for spouses of armed services members); *Reed v. Reed*, 404 U.S. 71, 73, 76–77 (1971) (statutory preference for male estate administrators).

Drawing on these equal protection principles, we have held that allegations of "persistent and unwelcome physical and verbal abuse" in the workplace "state a claim of sexual harassment, which can be impermissible sex discrimination in violation of the Equal Protection Clause." *Bator v. Hawaii*, 39 F.3d 1021, 1027, 1028 (9th Cir. 1994).

Here, Sampson complains that Obakhume sexually harassed her by commenting on her appearance and marital status, urging her to end her marriage, inappropriately touching her, and attempting to coerce her into riding in his vehicle. The district court found the constitutional right not to be sexually harassed by public officials providing social services was not clearly established outside of the workplace or school contexts.[6] Although we reluctantly agree that this right was not clearly established at the time of Obakhume's conduct, and therefore Defendants are entitled to qualified immunity in the instant case, we hold that the Equal Protection Clause protects the right to be free from sexual harassment at the hands of public officials providing social services.

To "'promote[] the development of constitutional precedent' in an area where [our] guidance is sorely needed," we first address whether Sampson asserts a violation of a constitutional right. *Mattos v. Aragano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson*, 555 U.S. at 236). We have broadly held—on multiple occasions—that "[w]ell prior to 1988 the protection afforded under the Equal Protection Clause was held to proscribe any purposeful

---

[6] We have also held that individuals in jails and prisons have a constitutional right to be free from sexual harassment under the Eighth Amendment. *See, e.g.*, *Vazquez*, 949 F.3d at 1165; *Wood v. Beauclair*, 692 F.3d 1041, 1046, 1048–51 (9th Cir. 2012).

discrimination by state actors, be it in the workplace *or elsewhere*, directed at an individual solely because of the individual's [sex]." *Oona R.-S.- by Kate S. v. McCaffrey*, 143 F.3d 473, 476 (9th Cir. 1998) (quoting *Lindsey v. Shalmy*, 29 F.3d 1382, 1386 (9th Cir. 1994)). Sexual harassment violates the Equal Protection Clause because, by definition, it is "motivated by gender." *Bator*, 39 F.3d at 1027.[7]

In *Alaska v. EEOC*, for example, senior male officials in the governor's office subjected the plaintiff to "sexual jokes" and "unsolicited physical conduct" because she was a woman. 564 F.3d 1062, 1068 (9th Cir. 2009) (en banc). Similarly, in *Bator*, male coworkers at Hawaii's probation department subjected a stenographer to "unwelcome physical and verbal abuse" because she was a woman. 39 F.3d at 1027. We also recognized in *McCaffrey* that the plaintiff was subjected to sexual harassment at the hands of her teacher and classmates "because of her gender." 143 F.3d at 475.

Here, a male social worker subjected Sampson to sexualized comments and unwanted physical advances because she is a woman. The only difference with prior cases is that Sampson's harassment was at the hands of a social worker assigned to her case, rather than a coworker,

---

[7] Our sister circuits have also explained that sexual harassment violates the Equal Protection Clause because it is, by definition, motivated by, or based upon, the survivor's gender. *See, e.g.*, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990), *superseded in part by statute as recognized in Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017); *Volk v. Coler*, 845 F.2d 1422, 1431 (7th Cir. 1988); *Bohen v. City of E. Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986).

supervisor, classmate, or teacher.    That difference is inconsequential because the Equal Protection Clause prohibits public officials, including social workers like Obakhume, from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Obakhume's conduct denied Sampson, because she is a woman, the right to seek legal guardianship of her niece and related services without being subjected to hostile sexual harassment.  Simply put, if she were a man, Sampson would not have experienced this harassment in seeking services from Obakhume, and that discrepancy fundamentally offends the equality and fairness principles embodied in the Equal Protection Clause.[8]

The right under the Equal Protection Clause to be free from sexual harassment by public officials in the workplace and school contexts is clearly established by our prior case law.  *See, e.g.*, *Alaska*, 564 F.3d at 1068–69 (workplace); *McCaffrey*, 143 F.3d at 476 (public schools); *Lindsey*, 29 F.3d at 1386 (sexual harassment by public employees in the workplace); *Bator*, 39 F.3d at 1027. However, as Sampson acknowledges, these cases are factually distinguishable, and we have never held that the Equal Protection Clause protects private individuals who suffer

---

[8] To be clear, not all allegations of sexual harassment leveled against public officials are sufficiently egregious to constitute a constitutional violation.   In the employment and education contexts, we require plaintiffs to plausibly allege that they suffered "purposeful, invidious" harassment.  *Bator*, 39 F.3d at 1029.  Moreover, in order to hold the perpetrator's supervisors accountable for the harassment, including the office or department the perpetrator works for, we require plaintiffs to plausibly allege either that the office or department had an official policy of promoting sexual harassment, or that the plaintiff's supervisors intentionally refused to redress the perpetrator's sexual harassment. *See Alaska*, 564 F.3d at 1069.

sexual harassment at the hands of public officials providing them with social services.  Thus, we cannot say that the question raised by Sampson's claim was "beyond debate" when the conduct as issue occurred here.  *Barkes*, 135 S. Ct. at 2044 (quoting *al-Kidd*, 563 U.S. at 743).[9]

Although we find that Sampson has plainly alleged a constitutional violation here, for purposes of analyzing qualified immunity, we must heed the Supreme Court's repeated admonitions "not to define clearly established law at a high level of generality," *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela II*, 138 S. Ct. at 1152), because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced," *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *see also City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (quoting *al-Kidd*, 563 U.S. at 742)); *Brosseau*, 543 U.S. at 199 (same).  Therefore, because we cannot find a case with sufficiently similar facts, we cannot say that Sampson's right to be free from sexual harassment

---

[9] Sampson also argues that a social worker can be liable for sexual harassment under California law, thus putting Obakhume on notice that his conduct was prohibited.  *See* Cal. Civ. Code § 51.9.  But, in general, "a violation of state law does not lead to liability under § 1983." *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)); *see also Davis*, 468 U.S. at 194. Therefore, even if section 51.9 prohibits sexual harassment at the hands of social workers in California, it does not "clearly establish" the right to be free from sexual harassment under the federal Constitution.

at the hands of a social worker was clearly established under the Supreme Court's impossibly high bar.**[10]**

## V.  Conclusion.

We vacate the district court's grant of qualified immunity to Defendants on Sampson's First Amendment retaliation claim and remand for the district court to consider in the first instance whether she plausibly alleged a constitutional violation.

We reluctantly affirm, however, the district court's grant of qualified immunity to Defendants on Sampson's Fourteenth Amendment equal protection claim. Unfortunately, the Supreme Court's exceedingly narrow interpretation of  what constitutes a "clearly established" right precludes us from holding what is otherwise obvious to us—that the right of private individuals to be free from sexual harassment at the hands of public officials outside of the workplace and school contexts was clearly established under the Equal Protection Clause at the time of Defendants' conduct.

Although we are prevented from denying qualified immunity in the instant case, we want to make it abundantly

---

**[10]** Judge Zouhary's partial dissent disagrees with our conclusion that the law was not clearly established, reasoning that "a factually identical scenario is unnecessary."  To be clear, we agree that "a case directly on point" is not required.  *Ashcroft*, 563 U.S. at 741.  However, we must evaluate whether Defendants' conduct was clearly established "in light of *the specific context* of the case." *Brosseau*, 543 U.S. at 198 (emphasis added).  Here, as Judge Zouhary correctly points out, our precedent has placed the constitutional question beyond debate "in a variety of contexts, including prison, educational settings, and the workplace." But, until today, our law has not done so in the particular context at issue here.

clear moving forward—if it was not already—that State public officials violate our Constitution's promise of equal protection when they sexually harass the people they serve.

**AFFIRMED in part; VACATED in part; and REMANDED. Each party shall bear its own costs.**

---

HURWITZ, Circuit Judge, concurring in part and dissenting in part:

In relevant part, 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

I agree with my colleagues that Natia Sampson has plausibly alleged violations of both her First and Fourteenth Amendment rights. In a world in which the plain language of the statute controlled, that would end our analysis.

But, of course, it does not. We must also parse the judge-made doctrine of qualified immunity, which is found nowhere in the text of § 1983. *See Baxter v. Bracey*, 140 S. Ct. 1862, 1862–63 (2020) (Thomas, J., dissenting from denial of certiorari). And that doctrine requires—in this case and many others—the dismissal of facially plausible claims of constitutional violations because the right at stake was not

"clearly established" at the time of the violation.  Until the Supreme Court revisits its qualified immunity jurisprudence, as a constitutionally "inferior" court, U.S. Const. art. III, § 1, we must continue to struggle to apply it.

I agree with Judge Murguia that the doctrine, however ill-conceived, bars Sampson's otherwise plausible equal protection claim, and therefore concur in Section IV.B of the majority opinion.  But I am unable to reach a different conclusion as to Sampson's First Amendment retaliation claim, and therefore cannot join Section IV.A.

## I.

Before finding an asserted constitutional right was "clearly established" at the time of the alleged violation, we must under the Supreme Court's jurisprudence identify binding precedent that "placed the statutory or constitutional question beyond debate," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)), so that "every reasonable official would have understood that what he is doing violates that right," *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam) (cleaned up); *see also Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

To be sure, the Court has reiterated that a prior "case directly on point" is not required, *Mullenix*, 136 S. Ct. at 308 (cleaned up), and that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But much like Lucy of "Charlie Brown" fame, the Court repeatedly yanks away the football when lower courts

attempt to apply this language.[1]  Lower courts have been repeatedly rebuked for defining "clearly established law at a high level of generality," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (cleaned up), and "fail[ing] to identify a case" involving "similar circumstances," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam), "controlling authority" or "a robust consensus of cases of persuasive authority," *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018) (cleaned up).  Thus, although stating that qualified immunity does not protect the "plainly incompetent or those who knowingly violate the law," *Kisela*, 138 S. Ct. at 1152, the Court has protected wrongdoers unless the violated constitutional right was "particularized," *Pauly*, 137 S. Ct. at 552 (cleaned up), and defined "on the basis of the specific context of the case," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (cleaned up).

Although the Court has found this level of specificity "especially important in the Fourth Amendment context," *Kisela*, 138 S. Ct. at 1152 (cleaned up), it has not yet limited the requirement to those claims.[2]  In the First Amendment

---

[1] *See* Eric Schulmiller, *All Your Life, Charlie Brown. All Your Life: The Complete History of Lucy's Pulling the Football Away*, Slate (Oct. 8, 2014, 9:33 AM), https://slate.com/culture/2014/10/the-history-of-lucys-pulling-the-football-away-from-charlie-brown-in-peanuts.html.

[2] The qualified immunity test was adopted to serve the purpose of "balancing [the] competing values" of efficiency and "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service."  *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *see Baxter*, 140 S. Ct. at 1864 (Thomas, J., dissenting from denial of certiorari); *Davis v. Scherer*, 468 U.S. 183, 195 (1984) ("[O]ur cases strike [a balance] between the interests in vindication of citizens' constitutional rights and in public officials'

context, for example, the Court has admonished that "the right in question is not the general right to be free from retaliation for one's speech," but "the more specific right to be free from a retaliatory" act under the facts of the case. *Reichle v. Howards*, 566 U.S. 658, 665 (2012).  As a practical matter, therefore, we must identify a case substantially similar, or nearly identical in some contexts, to the one at hand to find "clearly established" what otherwise would seem to be clear constitutional rights.**[3]**

## II.

I agree with my colleagues that every competent public official should have understood in 2015 that he could not attempt to end a guardianship with false accusations in

---

effective performance of their duties.").  Even assuming the doctrine serves that purpose in the Fourth Amendment context, in which officers sometimes make split-second decisions, *see Kisela*, 138 S. Ct. at 1152, such considerations may not have equal force elsewhere.

**[3]** *See* Erwin Chemerinsky, Federal Jurisdiction § 8.6, at 580 (6th ed. 2012) ("There is an obvious tension between *Hope v. Pelzer*, declaring that there need not be a case on point to overcome qualified immunity, and *Brosseau v. Haugen* and *Ashcroft v. Al-Kidd*, finding qualified immunity based on the lack of a case on point . . . .  Not surprisingly, there is great confusion in the lower courts as to whether and when cases on point are needed to overcome qualified immunity."); Karen M. Blum, *Qualified Immunity: Time to Change the Message*, 93 Notre Dame L. Rev. 1887, 1889 (2018) ("[T]he Supreme Court has crafted their recent qualified immunity jurisprudence to effectively eliminate § 1983 claims by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong." (cleaned up)); *see also Knopf v. Williams*, 884 F.3d 939, 949–50 (10th Cir. 2018); *Sebesta v. Davis*, 878 F.3d 226, 234–35 (7th Cir. 2017); *Morgan v. Swanson*, 659 F.3d 359, 371–74 (5th Cir. 2011) (en banc); *id.* at 391–94 (Dennis, J., concurring in part); *Jennings v. Jones*, 499 F.3d 2, 26 (1st Cir. 2007) (Lynch, J., dissenting).

retaliation for the guardian's exercise of protected speech.  It has long been clear that the government cannot "deny a benefit to a person because of his constitutionally protected speech," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), and "that as a *general matter* the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (emphasis added).  But "general" is not good enough for the Supreme Court.  *See Reichle*, 566 U.S. at 665 (rejecting as too general the "settled" rule that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" (cleaned up)).

So, the determinative question is whether Sampson can point to a case close enough to hers that "warned" the alleged violators that what they were doing was constitutionally forbidden.  The only case that Sampson (or the majority) cites that approaches the requisite level of specificity is *Capp v. County of San Diego*, 940 F.3d 1046 (9th Cir. 2019).  *Capp* held that "[a] reasonable official would have known that taking the serious step of threatening to terminate a parent's custody of his children, when the official would not have taken this step absent her retaliatory intent, violates the First Amendment."  *Id.* at 1051, 1059.  But our opinion in *Capp* came down years after the conduct at issue in this case occurred.**[4]**  As a matter of pure logic, because *Capp* found the asserted constitutional right clearly established at the time of the official's actions in that case, August 2015, it ought to mean that the same right was clearly established

---

**[4]** I assume for today's purposes that Sampson, the legal guardian of H.S., was in a similar position to that of a biological or adoptive parent.

several months later, when the allegedly retaliatory conduct in this case occurred.

However, I do not read the Supreme Court's caselaw as allowing us to draw that logical conclusion—indeed, a panel of this Court has already been reversed for attempting something similar. *See Kisela*, 138 S. Ct. at 1154–55. The conduct at issue in *Kisela* occurred in 2010, and the panel cited a 2011 case that involved conduct from 2006, *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), as "suggestive" and "illustrative" of the clearly established law in 2006, even if not "indicative." *Hughes v. Kisela*, 862 F.3d 775, 778, 783 n.2 (9th Cir. 2016). The Supreme Court found no "apparent" difference between relying on the 2011 case as illustrative, rather than indicative, and rejected *Glenn* as "of no use in the clearly established inquiry." *Kisela*, 138 S. Ct. at 1154 (cleaned up). The Court stated that *Glenn* "could not have given fair notice to Kisela [in 2010] because a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious." *Id.* (cleaned up); *see also Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam) ("The parties point us to a number of other cases in this vein that postdate the conduct in question . . . . These decisions, of course, could not have given fair notice to Brosseau and are of no use in the clearly established inquiry.").

The same conclusion must obtain here. The "clearly established" inquiry focuses on the judicial opinions extant at the time of the conduct at issue, not on how subsequent cases characterize pre-existing law. Decided years after the relevant conduct here, *Capp* is of no use. And, the other cases upon which the majority relies simply establish, in factual contexts quite different than the one at hand, the

general principle that one has the right to be free from retaliation by public officials for her speech. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019) (retaliatory arrest claim); *Hartman*, 547 U.S. at 255–56 (retaliatory criminal prosecution); *Perry*, 408 U.S. at 595–97 (retaliatory decision not to rehire); *Mulligan v. Nichols*, 835 F.3d 983, 988, 989 n.5 (9th Cir. 2016) (retaliatory "media leaks" and "smear campaign"). Under the Supreme Court's jurisprudence, that is not enough. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam).

## III.

As to Sampson's Fourteenth Amendment claim, although it is also clear to me that any reasonable public official should have known that the conduct alleged in this case was illegal, I agree with Judge Murguia that at the time of Obakhume's conduct no case clearly established Sampson's constitutional right to be free from sexual harassment in receiving public services from a social worker. Qualified immunity therefore bars Sampson's claim, and Judge Murguia's opinion ably demonstrates why we are required to reach that unfortunate result.

ZOUHARY, District Judge, concurring in part and dissenting in part:

With respect to the First Amendment claim, I agree with Judge Murguia that the application of qualified immunity was improper. When the conduct at issue took place, it was clearly established that public officials may not threaten to remove a child from an individual's custody in retaliation for protected speech. I therefore join in Section IV.A of the opinion.

As for the Equal Protection claim, I agree that Defendant Obakhume's alleged actions violated Sampson's constitutional right to be free of sexual harassment. However, I disagree that this right is not yet clearly established.

The doctrine of qualified immunity is meant to balance two competing interests: Government officials must be allowed to reasonably perform their duties, but they also must be held accountable when they irresponsibly exercise governmental power. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Properly applied, the doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," but does not protect "the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). Taking the facts alleged in the Complaint as true, Obakhume is in the latter category.

I understand my colleagues' reluctance to find this constitutional right clearly established in light of recent admonitions from the Supreme Court. True, we must "not [] define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curium) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curium)). But that is not this case. As an initial point, much of the Court's recent precedent cautioning against broadly defining constitutional rights dealt with excessive force. The Court has "stressed that the specificity of the [right] is especially important in the Fourth Amendment context" because "excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *District of Columbia v.*

*Wesby*, 138 S. Ct. 577, 590 (2018); *Kisela*, 138 S. Ct. at 1153 (quotation marks and citations omitted). Such cases involve "split-second judgments" and implicate the "hazy border between excessive and acceptable force." *Kisela*, 138 S. Ct. at 1152–53 (citations omitted). Here, Obakhume had no quick decision to make—he allegedly undertook a persistent course of inappropriate conduct over several weeks. Context matters.

The Supreme Court has noted that "even though the very action in question has not previously been held unlawful . . . officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citation omitted). Thus, a factually identical scenario is unnecessary. Rather, we must determine whether the official had "fair notice" that his actions were unconstitutional. *Id.* at 731. This Circuit has repeatedly held that the right to be free of sexual harassment by public officials is clearly established in a variety of contexts, including prison, educational settings, and the workplace. *See Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1165–66 (9th Cir. 2020); *Oona R.-S.- by Kate S. v. McCaffrey*, 143 F.3d 473, 476 (9th Cir. 1998); *Bator v. State of Hawai'i*, 39 F.3d 1021, 1027–28 (9th Cir. 1994). These cases clearly define the law on sexual harassment in this Circuit: public officials cannot sexually harass others while on the job. This is true irrespective of whether the other person is a coworker, or a consumer of government services—who has no choice but to interact with the public official. Because existing cases place the unreasonableness of Obakhume's conduct "beyond debate," *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (citation omitted), he had "fair notice" that his conduct was unlawful.

Further, although the above case law clearly establishes Sampson's right, this is an "obvious case"—meaning a case on all fours is unnecessary. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Qualified immunity shields only those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido*, 139 S. Ct. at 503 (citation omitted). Novelty of circumstance does not preclude liability. *Hope*, 536 U.S. 730. "The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey, J., dissenting)). Taking Sampson's allegations as true, Obakhume's conduct is beyond the pale.[1]

Giving the Supreme Court's mandate a most narrow (and unrealistic) reading leads to a bizarre conclusion: Obakhume knew that he could not sexually harass others in his workplace if, and only if, they were employed by the County; but he was unaware (or confused or unsure) whether he could subject a client of his office to the same treatment. Although we clearly establish this right "going forward,"

---

[1] The state legislature passed a law on the very subject, prohibiting social workers from making unwanted sexual advances on members of the public. *See* CAL. CIV. CODE § 51.9. While "a violation of state law [generally] does not lead to liability under § 1983," *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998) (citations omitted), we may consider all "relevant" regulations and statutes in determining whether a reasonable official would have known the conduct at issue was unlawful. *See Hope*, 536 U.S. at 741–42.

there is no need to wait.  The time is now.  For this reason, I respectfully dissent from Section IV.B of the opinion.